No. 2-08-0958     Filed: 3-29-10

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| DAUN BOLGER, | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 07--MR--636 |
| | ) | |
| THE DEPARTMENT OF CHILDREN | ) | |
| AND FAMILY SERVICES and ERWIN | ) | |
| McEWEN, Director of the Department of | ) | |
| Children and Family Services, | ) | Honorable |
| | ) | Michael J. Colwell, |
| Defendants-Appellees. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the opinion of the court:

On October 26, 2007, the defendants, the Department of Children and Family Services (DCFS) through its Director, Erwin McEwen, denied plaintiff Daun Bolger's request to expunge an indicated report of medical neglect. On November 30, 2007, the plaintiff filed an action for administrative review in the circuit court of Kane County. On September 15, 2008, the trial court affirmed the DCFS decision. The plaintiff appeals from that order. We affirm.

In July 2006, the plaintiff and her husband took physical custody of a 10-year-old boy named Robert Villarreal at the request of his mother, Carol Rasmussen, who was unable to care for him. Robert had spina bifida and was mentally and physically handicapped. The plaintiff also had a 10-year-old son, Trevor, who suffered from Down syndrome. On December 24, 2006, the plaintiff gave the two boys a bath. After she had finished washing them, she left the bathroom to retrieve towels

from a linen closet. When she returned, she found that the hot water was turned on and Robert was sitting under the running water. The plaintiff removed both boys from the tub and noticed that Robert's upper chest, the back of his neck, and his upper back were pink. The plaintiff knew that Robert had been burned. The plaintiff was a licensed practical nurse and treated the burn with Silvadene cream, hydration, and Tylenol. On December 27, 2006, Robert's father, Mark Villarreal, who had recently learned that Rasmussen had turned physical custody of Robert over to the plaintiff, came to the plaintiff's house to retrieve Robert. When Villarreal and Robert reached Villarreal's house, he saw that Robert had severe burns. Villarreal took Robert to the emergency room, where Robert was hospitalized for three days to treat the burns. DCFS investigated the incident. As a result of its investigation, DCFS entered indicated findings against the plaintiff for child neglect and medical neglect.

On September 15, 2007, a hearing was held before an administrative law judge (ALJ) on the plaintiff's request to expunge the indicated reports of child and medical neglect. At the commencement of the hearing, the ALJ indicated that he had received a request to quash subpoenas issued to two school district employees who were Robert's teachers. The ALJ indicated that he quashed those subpoenas because he did not think the testimony of those witnesses would be probative of the issue to be decided. The plaintiff's attorney objected. The plaintiff's attorney stated that the witnesses, Ms. Ruda and Tina Nichols, would be able to provide probative testimony. The witnesses would testify that under the plaintiff's care, Robert had gained appropriate weight, stopped falling asleep in school, and had no more bed sores. They would also testify that when they saw the burns approximately one week after the incident, the burns did not appear to be significant. The ALJ noted the objection.

Thereafter, the plaintiff testified that her son Trevor and Robert were classmates. In July 2006, Robert's mother, Carol Rasmussen, indicated that she could no longer care for Robert, because of his handicaps. Robert was in a wheelchair but could crawl. Robert was able to get in and out of the bathtub on his own. Robert could say words but was unable to speak in sentences. He knew how to scream in case of emergency. He could use sign language but was unable to use the phone. He could feed himself. In December 2006, the plaintiff was Robert's "foster mother."

On the afternoon of December 24, 2006, the plaintiff helped Robert and Trevor take a bath. The bathtub had one faucet but separate handles for the hot and cold water. She ran warm water into the tub and then turned the water off. After the boys washed their bodies and their hair, she turned the water back on to rinse their hair with fresh water. After that, she went to get towels from a linen closet about seven feet away and heard the water running again. She did not think anything of it at first, but then she heard Trevor cry. That's when she realized that only the hot water was on. She also saw steam coming up from the water. She did not know which boy turned the water on. She was at the linen closet for only a couple of seconds. When the hot water was running, Robert was under the faucet with his head leaning to one side. He was not screaming. She turned the water off and removed both boys from the tub. She noticed that the back of Robert's neck and some of his back and chest were pink. Robert was not crying but she could tell from his facial expression that he was in a "little bit" of pain. The pain lasted less than an hour.

She dried Robert off and put Silvadene cream on his burns. It was a prescription burn cream that she had left over from a sunburn she previously suffered. The plaintiff did not know what degree of burn the cream was recommended to treat. After about an hour, Robert did not look like he was in pain. Besides the cream, she was also having Robert drink six ounces of fluid every hour.

She knew that Robert was burned but did not know the degree of the burns. On the evening of December 24, 2006, she gave Robert some Tylenol for pain. She did not seek any other medical treatment for Robert on that day.

The plaintiff further testified that on December 25, 2006, she noticed that the burns were red and swollen and that Robert's nose also appeared burned. Robert did not appear to be in pain on the 25th. She did not seek any other medical attention that day. She cleaned the burns with Ivory soap and applied more Silvadene cream. She continued to give Robert fluids but did not give him any Tylenol on that day. On December 26, 2006, the burns appeared the same. They did not appear infected. She did not seek any other medical attention on the 26th. She continued cleaning the burns with Ivory soap, applying the burn cream, and giving Robert extra fluids. The skin on Robert's chest was starting to peel a little bit.

The plaintiff testified that on December 27, 2006, the burns started to appear more red, swollen, and inflamed. The burn on Robert's back was also peeling. She did not know the degree of burn that Robert had suffered. She could not tell at that time if the burns had started to heal. On that day, she called Trevor's pediatrician, Dr. Kilani, around 1 p.m. She told Dr. Kilani about the burns and how she was treating them. Dr. Kilani told her that if the burns started to look infected, Robert would need to be seen, but that it seemed she was doing everything she could. She denied that Dr. Kilani told her twice that Robert should be seen by a doctor. The plaintiff testified that she was addressing the threat of infection by cleaning the burns with Ivory soap.

Dr. Reda Kilani testified that he was a pediatrician, licensed to practice medicine in Illinois. He knew the plaintiff because he had provided pediatric care to her son Trevor since Trevor was one month old. He recalled a December 27, 2006, phone conversation with the plaintiff. She informed

him of Robert's burns and how she had been treating them. She asked him whether she was treating the burns properly. She had stated that the child had second degree burns. He told her that applying the Silvadene cream was okay but that the child had to be seen by a doctor. He told her that twice. Dr. Kilani opined that a 10-year-old child with disabilities who may have sustained second degree burns should be seen by a doctor immediately, if the burns are significant. Although Dr. Kilani did not see the burns, from his conversation with the plaintiff he believed that the burns were significant because the plaintiff told him so. He told the plaintiff that Robert had to be seen by a physician and that he could not give a judgment over the phone. Dr. Kilani testified that he told the plaintiff that Robert had to be seen in order to evaluate the possibility of infection.

Dr. Louis Bolanos testified that he was a pediatrician and treated Robert on the morning of December 28, 2006. At that time, Robert was on the pediatric floor of Mercy Hospital. Robert had been brought to the emergency room the day before. Emergency room personnel told Dr. Bolanos that the child had burns but was stable. Robert was admitted to the hospital and stayed there over night. Dr. Bolanos made his rounds in the morning. He observed that Robert was burned on his chest and back. When he first saw Robert it was difficult to assess the burns. At first he believed that Robert had second and third degree burns and that Robert needed to be sent to a burn unit. After the burns were cleaned up, he saw that Robert had first and second degree burns. The burns were not infected. The first degree burns were on the chest. Robert had second degree burns on the chest and back. Dr. Bolanos noted that children are not usually admitted to the hospital for first and second degree burns. Robert was admitted because of his disabilities and the possibility of abuse. Robert was in the hospital for three days. By the time Robert was discharged, most of the burned tissue had healed and there was no infection.

Dr. Bolanos opined that when a minor child with Robert's special needs sustains a burn that causes blisters to form, the child should be taken to see a physician immediately. If there are no blisters, the burn will usually heal on its own. When he saw Robert there were some blisters. Dr. Bolanos did not know when Robert should have been brought to the hospital or seen by a doctor. When he saw Robert, the burns looked ugly and painful. First and second degree burns are usually painful. However, Robert was given Tylenol 3, so any pain was subdued. From the way Robert looked on the 28th, Dr. Bolanos opined that Robert should have been taken to a doctor immediately. However, he did not know when the blistering occurred and acknowledged that his opinion was in hindsight. When asked yet again whether Robert should have been brought to a doctor immediately after the burns occurred, Dr. Bolanos indicated that to the best of his ability and from what he saw, he would have to say yes.

On cross-examination, Dr. Bolanos acknowledged that it is possible to burn and then blister later. He also acknowledged that it was possible that there were no blisters when Robert sustained the burns. It was possible they just looked like sunburns, and he would not expect Robert to be brought in for a sunburn. Dr. Bolanos testified that Robert had first and second degree burns and that it was appropriate to treat first degree burns with Silvadene cream and hydration. While in the hospital, Robert was given Tylenol with codeine, treated with Silvadene cream, and given plenty of fluids. Additionally, the dead skin was removed. Dr. Bolanos acknowledged that Robert was admitted to the hospital primarily because of suspected abuse. He also testified that Robert was admitted because of the extent of the injury, the nature of his neurological problems, and the need to investigate of the cause of the burns.

Mark Villarreal testified that he was Robert's natural father. The plaintiff was taking care of his son on December 24, 2006. Although Robert had spina bifida and was in a wheelchair, he could ambulate by crawling. Robert was unable to speak. Villarreal first observed Robert at his home around 2 p.m. on December 27, 2006. He noticed that Robert had burns on his neck, back, and chest. They were red, oozing pus, and scabbed. Villarreal testified that Robert was in pain. Robert was crying and wincing. As he removed Robert's shirt, it stuck to his chest. When he took Robert to the hospital, Robert was admitted immediately. He was told that Robert's burns were third degree and that he needed medical attention. Robert was in the hospital for three days. When Robert was discharged, Villarreal was instructed to take Robert to a pediatrician the next day and to change Robert's burn dressings three times a day for six weeks. At the time of the hearing, the burns were healed but Robert's skin was permanently discolored. On cross-examination, Villarreal admitted that he had received a care plan that the plaintiff's husband had given him when he picked up Robert from the plaintiff's house on December 27, 2006. The care plan indicated that he should apply Silvadene cream to Robert's chest and back. However, the plan did not indicate the purpose of the cream.

Monique Boozer testified that she was employed by DCFS as a child protection investigator. She was assigned to investigate Robert's burns on December 27, 2006. She observed Robert at the hospital on that day. She was not able to speak with Robert, because he is noncommunicative. She spoke with the plaintiff on December 27, 2006, at the plaintiff's home. The plaintiff indicated that Robert was burned accidentally during a bath when she left the bathroom to retrieve towels and the hot water was accidentally turned on. The plaintiff also told her that she applied Silvadene cream and bag balm to the burns and was using Ivory soap to keep the burns clean. The plaintiff stated that she had tried to call a pediatrician on the day of the burns, but because it was Christmas Eve, no one

was available. The plaintiff indicated that she finally spoke to a pediatrician, Dr. Kilani, on December 27, 2006. The plaintiff said that she told Dr. Kilani about Robert's burns and how she was treating them. The plaintiff stated that Dr. Kilani told her that nothing else needed to be done.

Boozer testified that as part of her investigation she interviewed the plaintiff, the plaintiff's husband, Dr. Sanchez (the emergency room doctor at Mercy hospital), Dr. Bolanos, Villarreal, Rasmussen, Robert's teachers, and Robert's 14-year-old sister. The record also reveals that Boozer spoke with Dr. Kilani. As a result of her investigation, Boozer indicated the plaintiff for burn by neglect and medical neglect. Boozer's supervisor had agreed with the indications. Boozer testified that the indication for medical neglect was based on the fact that after Robert suffered the burns, he was not taken for treatment for three days. Boozer considered that the plaintiff applied Silvadene cream and gave Robert fluids. However, the plaintiff did not give Robert any medication for pain and no one was sure if Robert was in pain. Boozer also considered other factors. First, Boozer believed that, because the plaintiff was a nurse, she should have known to bring Robert to a doctor. Second, the plaintiff did not tell Villarreal on the 27th that Robert had been burned. Third, although Dr. Kilani had advised the plaintiff to bring Robert to a doctor, she had not done so by the time Robert was picked up by Villarreal. Additionally, she considered Robert's special needs and the degree of the burns in making her indications. Boozer acknowledged that Dr. Bolanos told her the burns were second and third degree. Boozer did not learn that the burns were only first and second degree until the day of the hearing. On cross-examination, Boozer acknowledged that she did not know what the burns looked like on the 24th, 25th, or 26th and that she did not have any specific indication that Robert was in pain on those days. However, she believed that burns like Robert's would be painful. DCFS rested.

The plaintiff testified on her own behalf that Rasmussen was at her house on December 24, 2006. She identified pictures that were taken as everyone was opening Christmas presents. The photos showed red burns on Robert's neck and chin and Silvadene cream on the side of Robert's face. On the 24th, Robert's burns were pink and red but there were no blisters. They looked like sunburns. They looked the same on the 25th and 26th. She acknowledged that she told Boozer that she was starting to second-guess herself on the 27th. On the 27th, some of Robert's burns had blistered and that is why she called Dr. Kilani. Dr. Kilani told her that Robert needed to be seen. However, she thought Dr. Kilani meant that Robert needed to be seen in general, because he had never treated Robert before. Nonetheless, she intended to take Robert to the doctor. However, within two hours of speaking with Dr. Kilani, Villarreal came to get Robert.

The plaintiff further testified that on December 27, 2006, Robert had been living with her family for about six months. When Robert came to live with her in June 2006, he was malnourished and underweight, had bedsores, was noncommunicative, did not know sign language, never smiled or laughed, and would not move from his wheelchair. While Robert was living with her, he gained almost 30 pounds, no longer had bedsores, learned sign language, and stopped falling asleep in school. She cured his bedsores with bag balm. She never put bag balm on his burns. On the day that Robert was burned she was only seven feet away at the linen closet retrieving towels. It took only about 30 seconds to get the towels. The plaintiff testified that Robert was not noncommunicative. He could show you that he was in pain by sign language, crying, or facial expressions. She heard him yell out once when he had surgery. He would also cry from pain if he and Trevor were wrestling. On the day of the burns and the two days following, Robert was "not in any sort of distress."

The plaintiff testified that although Rasmussen had told her that Robert's father was not around, the plaintiff did not believe her. The plaintiff's husband did some investigation and was able to track down Villarreal. On December 22, 2006, they invited Villarreal to their home to visit Robert. The ALJ asked the plaintiff what her legal relationship was to Robert. The plaintiff's attorney indicated that they had filed a petition for guardianship of Robert. The petition was pending at the time of the burn incident. Finally, the plaintiff testified that she did not tell Villarreal about Robert's burns on December 27, 2006, because she was too upset that Robert was being taken away.

On October 18, 2007, the ALJ issued a written recommendation and opinion. The ALJ found that on December 24, 2006, Robert was living with the plaintiff because Rasmussen could not meet his complex needs. Robert was handicapped mentally and physically. Although Robert could scream for help, he was not always cognitive of when he needed help. The ALJ found that Robert had been burned while he was bathing with the plaintiff's son Trevor. The plaintiff went to the linen closet seven feet away to retrieve towels. One of the boys turned the hot water on. Robert was under the running hot water, which caused burns on his upper back and chest, right shoulder/neck area, and nose. Robert was in pain but did not scream.

The ALJ noted that the plaintiff testified that the burns looked like sunburns. The plaintiff treated them with burn ointment and regular hydration. The plaintiff also gave Robert Tylenol before he went to bed that night. The ALJ noted that this was "appropriate action to take for a burn injury." However, the ALJ further noted that the plaintiff was not aware of the degree of burn she was treating. The next two days the burns were more red and swollen. By the 27th, the burns were also peeling and inflamed. The plaintiff called Dr. Kilani but the plaintiff stated that Dr. Kilani did not

tell her to bring Robert in for examination. The ALJ noted that Dr. Kilani testified that he twice told the plaintiff to bring Robert in for examination because there was a risk of infection.

The ALJ noted that Villarreal went to the plaintiff's home on the 27th to regain custody of Robert. The plaintiff did not tell Villarreal that Robert needed to be seen by a doctor. When Villarreal got home with Robert he realized the extent of Robert's burns and took Robert to the emergency room. Robert was admitted to the hospital for evaluation, treatment, and his own protection until the cause of the burns could be determined. Robert was initially diagnosed with second and third degree burns, but the amended diagnosis indicated first and second degree burns. At the hospital, Robert's burns were cleaned every eight hours with a sodium chloride flush and then Silvadene cream was applied. The burns were then rebandaged with nonsticking gauze. Robert was discharged three days later and recovered from his burn injuries. The ALJ noted that Dr. Bolanos testified that the plaintiff should have brought Robert in for treatment when the injuries occurred and certainly when blisters formed.

The ALJ commented that DCFS had indicated the plaintiff for child neglect allegation No. 55, burns, and child neglect allegation No.79, medical neglect. The DCFS rationale for burn by neglect was the finding that the plaintiff was not in the vicinity of the bathtub when the burns occurred. The DCFS rationale for medical neglect was the fact that the plaintiff did not take Robert for treatment between December 24 and 27, 2006. The ALJ determined that DCFS had not proven that the plaintiff had acted in blatant disregard of Robert's safety, an element necessary to meet its evidentiary burden for burn by neglect. The ALJ determined that the plaintiff was near the bathroom at all times and that the threat of harm was not imminent or apparent when she went to the linen

closet to retrieve towels. Accordingly, the ALJ recommended that the plaintiff's request to expunge the indicated finding for burn by neglect be granted.

With respect to the finding of medical neglect, the ALJ noted that DCFS had to prove that the plaintiff's failure to seek medical treatment for Robert could have caused the injury to constitute a serious or long-term harm, a premise that had to be verified by a physician or registered nurse. The ALJ noted that both Dr. Bolanos and Dr. Kilani testified that, based on the extent of Robert's burns, the plaintiff should have taken him to a doctor immediately for evaluation and treatment. The ALJ found that the plaintiff misdiagnosed the severity of Robert's burns and that the plaintiff was not qualified to evaluate the degree to which Robert was burned. The ALJ determined that the plaintiff was not qualified to determine the appropriate pain relief and did not have the medical training to determine that Robert did not need treatment by a doctor. The ALJ determined that due to Robert's special needs and particular vulnerability, it was imperative that he be taken to a physician when the burns occurred. Because Robert was unable to fully communicate, it was necessary for a doctor to assess Robert's level of pain and prescribe the necessary treatment. The ALJ noted that if a burn is not treated properly, there is a risk of infection and permanent skin damage. The ALJ concluded that the plaintiff's failure to take Robert to be evaluated by a doctor constituted medical neglect and recommended that the plaintiff's request to expunge the indicated finding for medical neglect be denied.

On October 26, 2007, DCFS issued its final determination granting the plaintiff's request to expunge the indicated finding for burn by neglect but denying the request to expunge the indicated finding for medical neglect. DCFS adopted and incorporated the ALJ's specific findings of fact and conclusions of law. The plaintiff sought judicial review of the DCFS decision. On September 15,

2008, the circuit court of Kane County affirmed the DCFS decision. Thereafter, the plaintiff filed a timely notice of appeal.

On appeal, the plaintiff first argues that the ALJ erred in quashing the subpoenas of two independent witnesses who were going to testify that Robert's burns did not appear to be significant. Specifically, the plaintiff argues that "there is no provision contained in the Illinois Administrative Code, nor the DCFS rules of procedure, that allows an administrative agency to quash a properly issued subpoena." Whether the ALJ had the legal authority to quash the properly issued subpoenas is a legal question that we review de novo. Cinkus v. Village of Stickney Municipal Officers Electoral Board, 228 Ill. 2d 200, 210 (2008). At the outset, we note that the plaintiff has forfeited this argument by failing to raise it before DCFS. See City of Washington v. Illinois Labor Relations Board, 383 Ill. App. 3d 1112, 1123 (2008) (an argument not raised during the pendency of an administrative proceeding is deemed forfeited and cannot be asserted for the first time on judicial review). At the hearing, the plaintiff objected to the ALJ's decision to quash the subpoenas on the merits, arguing that the testimony would be probative of the issues to be determined. The plaintiff did not argue that the ALJ lacked the legal authority to quash the subpoenas.

Even absent forfeiture, we find the plaintiff's argument to be without merit. In support of her contention, the plaintiff cites to section 14.30 of the Illinois Administrative Code, Title 89, chapter IV, subchapter A, part 14, subpart A, which states:

> "Subpoenas must be requested by the appellant prior to the hearing. Subpoenas may be granted at the discretion of the hearing officer or other assistant hearing administrator if a hearing officer has not been appointed." 89 Ill. Adm. Code §14.30.

However, this provision applies to "Public Assistance appeals filed by or on behalf of applicants or recipients of assistance under the Department of Human Services." 89 Ill. Adm. Code §14.1. The plaintiff fails to recognize that DCFS rules expressly authorized the ALJ to quash the subpoenas issued by the plaintiff. The administrative hearing and review process that DCFS guarantees to persons requesting to expunge an indicated finding from the State Central Register is governed by the Illinois Administrative Code, Title 89, chapter III, subchapter B, part 336. See 89 Ill. Adm. Code §336.10. Section 336.120(b)(8) of Title 89 of the Illinois Administrative Code expressly authorizes an ALJ to "quash or modify subpoenas for good cause, including but not limited to relevance, scope, materiality and emotional harm or trauma to the subpoenaed witness." 89 Ill. Adm. Code §336.120(b)(8), amended at 24 Ill. Reg. 7660, 7681, eff. June 1, 2006. In the present case, the ALJ properly quashed the subpoenas because the testimony of two teachers that Robert's burns did not appear to be significant one week after he was hospitalized would not be relevant to a determination of medical neglect pursuant to the Illinois Administrative Code. The teachers were not qualified to assess the proper medical treatment or to give an opinion on the serious or long-term harm. See 89 Ill. Adm. Code §300 app. B, amended at 24 Ill. Reg. 12781, 12806, eff. October 1, 2001. As such, the ALJ properly quashed the subpoenas as a matter of law.

The plaintiff's second contention on appeal is that DCFS and the trial court erred in denying her request to expunge the indicated finding against her for medical neglect. When DCFS enters an indicated finding against a person for medical neglect, that person may administratively appeal the determination by requesting in writing that DCFS "amend the record or remove the record of the report" from the central register. 325 ILCS 5/7.16 (West 2008); see also 89 Ill. Adm. Code §336.40(c), amended at 24 Ill. Reg. 7668, eff. June 1, 2000. On appeal, DCFS carries the burden

of proof in justifying the refusal to expunge and it must prove that a preponderance of the evidence supports the indicated finding. 89 Ill. Adm. Code §336.100(e), amended at 24 Ill. Reg. 7675, eff. June 1, 2000. DCFS defines "medical neglect" as the:

"Lack of medical or dental treatment for a health problem or condition that, if untreated, could become severe enough to constitute a serious or long-term harm to the child ***." 89 Ill. Adm. Code §300 app. B, amended at 25 Ill. Reg. 12806, eff. October 1, 2001.

A number of factors should be considered when determining whether a child was medically neglected: "- [the] child's age, particularly as it relates to the ability to obtain treatment.

- child's developmental stage.

- child's physical condition.

- seriousness of the current health problem.

- probable outcome if the current health problem is not treated and the seriousness of that outcome.

- generally accepted medical benefits of the prescribed treatment.

- generally recognized side effects/harms associated with the prescribed treatment.

[Furthermore,] [i]t must be verified that the child has/had an untreated health problem ***. Such verification must come from a physician, registered nurse, dentist, or by a direct admission from the alleged perpetrator. It must further be verified by a physician, registered nurse or dentist that the problem or condition, if untreated, could result in serious or long-term harm to the child." 89 Ill. Adm. Code §300 app. B, amended at 25 Ill. Reg. 12807, eff. October 1, 2000.

In reviewing a final decision under the Administrative Review Law (735 ILCS 5/3--101 et seq. (West 2006)), we review the administrative agency's decision and not the trial court's determination. XL Disposal Corp. v. Zehnder, 304 Ill. App. 3d 202, 207 (1999). There are three types of questions that a court may encounter on administrative review of an agency decision: questions of fact, questions of law, and mixed questions of fact and law. Cinkus, 228 Ill. 2d at 210. "An administrative agency's findings and conclusions on questions of fact are deemed prima facie true and correct." Cinkus, 228 Ill. 2d at 210. A reviewing court is limited to determining whether the agency's findings of fact are against the manifest weight of the evidence. Cinkus, 228 Ill. 2d at 210. An administrative agency's decision is against the manifest weight of the evidence "only if the opposite conclusion is clearly evident." Abrahamson v. Illinois Department of Professional Regulation, 153 Ill. 2d 76, 88 (1992). "If there is anything in the record which fairly supports the agency's decision, such decision is not against the manifest weight of the evidence and must be sustained upon review." Grams v. Ryan, 263 Ill. App. 3d 390, 396 (1994).

In contrast, an agency's decision on a question of law is not binding on a reviewing court and is reviewed de novo. City of Belvidere v. Illinois State Labor Relations Board, 181 Ill. 2d 191, 205 (1998). When a case involves an examination of the legal effect of a given set of facts, it involves a mixed question of fact and law. City of Belvidere, 181 Ill. 2d at 205. Mixed questions of fact and law are reviewed under a "clearly erroneous" standard. Cinkus, 228 Ill. 2d at 211. An agency's decision is clearly erroneous when the reviewing court is left with the " ' "definite and firm conviction that a mistake has been committed." ' " Cinkus, 228 Ill. 2d at 211, quoting AFM Messenger Service, Inc. v. Department of Employment Security, 198 Ill. 2d 380, 393 (2001), quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 92 L. Ed. 746, 766, 68 S. Ct. 525,

542 (1948). In the present case, a determination of whether DCFS erred in denying the plaintiff's request to expunge the indicated finding against her for medical neglect involves a determination of whether the facts satisfy the agency's legal standard for medical neglect. Accordingly, the DCFS determination is reviewed under the clearly-erroneous standard.

Upon review of the record, we cannot say that the agency's decision was clearly erroneous. The ALJ's findings of fact, adopted by DCFS, are not against the manifest weight of the evidence. The ALJ found that the plaintiff was not qualified to assess the degree of Robert's burns. Although the plaintiff was a licensed practical nurse, there was no evidence that this designation qualified her to assess Robert's burns. Furthermore, the ALJ noted that both Drs. Kilani and Bolanos testified that the plaintiff should have brought Robert to a doctor for medical treatment immediately after the injury occurred. The doctors' testimony indicated that due to the significant size of the burns, Robert needed to be evaluated for risk of infection, the degree of the burns, and the necessary treatment. We acknowledge that Dr. Bolanos also testified that generally first and second degree burns do not need treatment by a physician unless blisters start to form and that blisters can form days after the original burn. Dr. Bolanos acknowledged that he did not know when Robert's burns had formed blisters. The plaintiff testified that the blisters did not appear until December 27. Nonetheless, we cannot reverse administrative findings on the "mere fact that an opposite conclusion is reasonable or that [we] might have ruled differently." Abrahamson, 153 Ill. 2d at 88. Accordingly, based on our review of the testimony in the present case, we conclude that the ALJ's findings of fact as contained in his October 18, 2007, recommendation and opinion are not against the manifest weight of the evidence.

Furthermore, the agency's determination that these findings satisfied the requirements of medical neglect was not clearly erroneous. The agency was required to prove (1) that Robert lacked medical treatment for a health problem (2) "that, if untreated, could become severe enough to constitute a serious or long-term harm" to him. Both prongs had to be verified by a physician or registered nurse. See 89 Ill. Adm. Code §300 app. B, amended at 25 Ill. Reg. 12806, eff. October 1, 2001. It is clear that Robert had a health problem, burns from scalding hot bath water. Dr. Bolanos testified that Robert sustained first and second degree burns across large portions of his chest, neck, and upper back. It is also clear that Robert lacked appropriate medical treatment. As stated above, both Drs. Kilani and Bolanos testified that Robert's condition required that he be evaluated by a doctor to determine the proper course of medical treatment. This was based on a consideration of Robert's age, his special needs, and the extensive area of the burns.

The plaintiff argues that Robert did not lack medical treatment, because she was treating him with Silvadene cream and hydration. She further argues that this was the same treatment Robert received in the hospital and that both the ALJ and Dr. Bolanos indicated that this treatment was appropriate. As stated above, the ALJ found as a matter of fact that the plaintiff was not qualified to treat Robert's burns, and this finding was not against the manifest weight of the evidence. The plaintiff testified that she did not know the degree of Robert's burns and did not know what degree of burn the Silvadene cream was meant to treat. She knew only that the cream had been prescribed to her for a previous sunburn and that Robert's burns initially looked like sunburns. The ALJ commented only that Silvadene cream and hydration were appropriate for a burn injury in general, not that this treatment was appropriate for Robert's burns, because the plaintiff did not know the degree of the burns. Dr. Bolanos testified that Silvadene cream and hydration were appropriate

treatment for first degree burns. However, Dr. Bolanos also testified that Robert had first and second degree burns.

Moreover, when Robert was in the hospital, the treatment he received was more extensive than the treatment he had received from the plaintiff. The hospital staff cleaned Robert's burns with a sodium chloride flush, applied Silvadene cream, redressed his burns with nonsticking gauze every eight hours, gave him intravenous fluids and pain medication, and removed the dead skin. Although the plaintiff applied Silvadene cream, increased Robert's fluid intake, and cleaned the burns with Ivory soap, she did not treat him for pain after the first night, remove the dead skin, or dress his burns. The plaintiff argues that there was no evidence that Robert was in pain after she applied the Silvadene cream (which was less than one hour after the incident). However, Villarreal testified that when he brought Robert home and removed Robert's shirt, the shirt stuck to the burns and Robert was crying and wincing in pain. Additionally, Dr. Bolanos testified that first and second degree burns, with which Robert was diagnosed, are painful. Finally, the plaintiff argues that she had intended to take Robert to a doctor until Villarreal showed up to claim Robert. Nonetheless, although she gave Villarreal a written care plan for Robert, she did not tell Villarreal about Robert's burns or that Robert needed to be taken to a doctor. Moreover, the plaintiff denied that Dr. Kilani had instructed her to bring Robert in for an evaluation. Thus, the evidence supports the ALJ's determination that Robert had a health problem that lacked proper medical treatment.

Additionally, there was testimony supporting a determination that Robert's condition, if untreated, could have caused serious or long-term harm. Dr. Kilani testified that the burns had to be treated by a doctor immediately because of the risk of infection. Dr. Bolanos testified that Robert suffered first and second degree burns. However, when he first saw Robert on the 28th, the burns

looked so serious that Dr. Bolanos thought they were third degree burns and considered sending Robert to a burn unit. Dr. Bolanos testified that, by the time Robert was discharged from the hospital three days later, the burned tissue was healed and there was no infection. We acknowledge that neither doctor specifically testified that Robert's burn injuries, "if untreated, could result in serious or long-term harm." However, Dr. Kilani's testimony supports a determination that if untreated, Robert's injuries could become infected. Additionally, Dr. Bolanos' testimony supports a determination that after the burns had lacked proper medical treatment for three days, the condition became very serious and the long-term risks included tissue damage and infection. Accordingly, we are not left with the "definite and firm conviction that a mistake has been committed."

We acknowledge the plaintiff's generosity in providing extraordinary care and support for Robert. Through the plaintiff's care Robert was able to gain weight, pay better attention at school, and learn new skills. As found by the ALJ, Robert's overall physical and mental condition improved while he lived with the plaintiff. Nonetheless, we are bound by our standard of review and cannot say that the DCFS decision denying the plaintiff's request to expunge the indicated finding against her for medical neglect was clearly erroneous. See Cinkus, 228 Ill. 2d at 211.

For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed.

Affirmed.

BOWMAN and BURKE, JJ., concur.