2023 IL App (2d) 220095-U
No. 2-22-0095
Order filed December 19, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| MARIANNA SHTEINGOLD, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 21-MR-449 |
| | ) | |
| ILLINOIS DEPARTMENT OF CHILDREN | ) | |
| AND FAMILY SERVICES; and MARC D. | ) | |
| SMITH IN HIS CAPACITY AS ACTING | ) | |
| DIRECTOR OF THE ILLINOIS DCFS, | ) | Honorable |
| | ) | Luis A. Berrones, |
| Defendants-Appellees. | ) | Judge, Presiding. |

JUSTICE MULLEN delivered the judgment of the court.
Justices Hutchinson and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) The decision of the director of DCFS decision not to expunge indicated finding was clearly erroneous; but (2) plaintiff was not prejudiced by the administrative law judge's treatment of live testimony and letters; and (3) plaintiff's due process rights were not violated.

¶ 2    The Illinois Department of Children and Family Services (Department) investigated a report that plaintiff, Marianna Shteingold, had abused her then-14-year-old adopted daughter. Following its investigation, the Department entered two indicated findings of abuse against the plaintiff. The first, allegation of harm number 10, was for creating a substantial risk of injury to

the child. The second, allegation number 11, was for causing bruises, welts, or abrasions on her daughter. Plaintiff then pursued an administrative appeal, seeking to have the indicated findings expunged from the state central register. The Acting Director of the Department, Marc Smith (Director), denied the request for expungement. The circuit court of Lake County: (1) reversed the Director's decision as to allegation number 10 as against the manifest weight of the evidence and expunged that finding; and (2) affirmed the Director's decision as to allegation number 11. Plaintiff appeals the decision regarding allegation number 11. We reverse.

¶ 3                                      I. BACKGROUND

¶ 4     Plaintiff is the adoptive mother of R.T., who was first placed in plaintiff's care in 2017. R.T.'s placement with plaintiff was a specialized foster care case because R.T. had multiple mental health diagnoses, including trauma, depression, and oppositional defiant disorder. In 2019, plaintiff adopted R.T. The adoption was also specialized, and plaintiff completed foster parent trainings related to trauma and attachment. Additionally, services were provided to R.T. and plaintiff, such as individual therapy, group therapy, family therapy, and medication management.

¶ 5     When the COVID-19 pandemic started and schools closed in March of 2020, the relationship between R.T. and plaintiff became tense. R.T. was frustrated because she was stuck at home and could no longer see her friends or her peers at school. Plaintiff, a musician who earns a living by teaching and performing, lost her jobs and did not qualify for unemployment benefits until May of 2020. Due to the increased tensions within the household, plaintiff sought outside assistance for R.T.

¶ 6     In August of 2020, R.T. learned that her school would not resume in person. She was frustrated, which led to an escalation in her behavior. On the night of September 24, 2020, an argument ensued between R.T. and plaintiff. R.T. refused to go to bed, yelled, cursed, and began

throwing things. As a punishment, plaintiff tried to take away R.T.'s iPad. During this altercation, R.T. got close to plaintiff, attempting to grab the iPad back. Plaintiff then slapped R.T. on the face. R.T. was wearing semi-rimmed glasses and the bottom of the frame, which was rimless, left a scratch on her nose about one inch long.

¶ 7    On September 25, 2020, R.T. had a therapy appointment via Zoom with her therapist Laura Clark. During her therapy session, R.T. disclosed the incident from the night before. Through the video call, Clark believed she saw a cut on R.T.'s nose and a bruise on R.T.'s cheek. Clark reported this incident to the Department. An on-call case worker from the Department, Melissa Vance, visited that evening and observed the cut on R.T.'s nose. Vance took a photograph of the cut and asked if this type of incident had happened before. R.T. replied that it had, and that the last time was in May. Plaintiff admitted to Vance that she had hit her daughter, stating that she hit her daughter because her daughter was aggressive.

¶ 8    The Department contacted the Buffalo Grove Police Department. Officer Dawid Wojs was sent to the plaintiff's home the same night. Wojs spoke with both R.T. and plaintiff. R.T. told Wojs that she and her mom were arguing and she got too close to her mom, at which point her mom slapped her with an open hand. R.T. told Wojs that she felt safe at home. Plaintiff told Wojs that her daughter suffers from rage issues and when her daughter aggressively approached her during the argument, plaintiff slapped her to get some distance between them.

¶ 9    On March 18, 2021, a hearing was held on plaintiff's administrative appeal. The primary investigator from the Department on this case was Jessica Lyman. At the time of the hearing, Lyman no longer worked for the Department and therefore did not testify. Lyman's supervisor, Julie Cummings, testified that the Department indicated the case because the child was adopted, cursed at her mother, and after cursing at her mother, her mother slapped her in the face which

caused a scratch on her nose. Cummings also testified that allegations of verbal abuse by plaintiff were considered when deciding to indicate the allegations of abuse.

¶ 10    Clark testified about the Zoom therapy appointment with R.T., where R.T. disclosed that plaintiff had slapped her. Clark stated that she knew R.T. to be the verbal aggressor on certain occasions, but that nearly every week she had seen R.T., there had been either a verbal altercation that resulted in conflict or some type of verbal emotional abuse, such as plaintiff calling R.T. a "bitch," "worthless," or a "psychopath." Some of these altercations were, to her knowledge, physical. Wojs then testified after Clark. Wojs testified to what was written in his police report. He did not see a bruise on R.T.'s face but did see a scratch. He stated that R.T. told him she felt safe at home.

¶ 11    The Department also called Vance to testify. Vance stated that she interviewed R.T., who explained that she had gotten into an argument with her mother, became disrespectful, and was then slapped by her mother, causing a cut to the nose. Vance observed the cut to be about an inch in length. Vance recalled that R.T. told her that there were other incidents that escalated to a point where plaintiff became violent. Plaintiff admitted to Vance that she had hit R.T. and said she did so because her daughter's behavior escalated. According to Vance, plaintiff stated that she would hit her daughter again as a form of discipline. After further inquiry into what caused R.T. to escalate, R.T. explained that art was her usual coping mechanism and it had been taken away from her as a punishment. Vance also stated that plaintiff told her that she had adopted the minor from the Department, and the Department "should be grateful" that plaintiff had done that. Additionally, while Vance was interviewing plaintiff, R.T. walked into the room. She witnessed R.T. and plaintiff get into a verbal argument over R.T.'s therapy. It was apparent that plaintiff did not like the way things were going with R.T.'s therapy because a report had been made with the

Department. Listening to the argument, Vance gathered that R.T. wanted to continue with therapy, particularly group therapy with her peers, and plaintiff was working to switch providers.

¶ 12　Plaintiff called Meghan Luse to testify. Luse testified that she is an adoption support specialist with Metropolitan Family Services who worked with R.T. and plaintiff. Luse discussed R.T.'s behavior and diagnoses, stating that R.T. has specified trauma and a stressor-related disorder. Luse also testified that R.T. "has complex trauma, which comes with a lot of attachment loss, feelings of resentment towards her parents [and] authority figures," as well as oppositional defiant disorder, which can lead to her become easily irritated, argumentative, defiant of authority, and potentially vindictive at times. Luse also stated that she had received reports from plaintiff about R.T.'s physically aggressive behavior and had witnessed R.T. acting verbally aggressive during session. Luse testified that R.T. admits she sometimes becomes physically aggressive. On cross-examination, Luse stated that it is not advisable that a person physically confront a child diagnosed with oppositional defiant disorder. On re-direct, Luse testified that while plaintiff did admit to slapping R.T., Luse had nonetheless observed plaintiff's motivation to be a better parent, "going above and beyond" to meet R.T.'s academic needs. Luse stated that she was not concerned with how plaintiff takes care of R.T. Luse also wrote a letter about her observations of R.T. and plaintiff, which was admitted into evidence without objection from the Department.

¶ 13　Next, plaintiff called her friend Ellen Zemmel to testify. Zemmel testified to her opinions about R.T. and plaintiff's relationship. Zemmel did not see the September 24 incident and stated that she only knew about the case through what plaintiff had told her. Zemmel wrote a letter that was admitted into evidence. Zemmel also testified that plaintiff is a truthful person.

¶ 14　Plaintiff also called friends Masha Lakisova and Lyudmila Lakisova to testify. Both women had known plaintiff for many years and frequently interacted with R.T. and plaintiff.

Neither woman saw the September 24 incident. In sum, both women testified that R.T. and plaintiff had a loving relationship, although R.T. sometimes struggles with her behavior. Masha testified that R.T. has an attitude at times. Lyudmila stated that she had talked to R.T. about R.T.'s behavior on prior occasions, and R.T. admits that sometimes she yells, screams, and curses and cannot control herself during these episodes.

¶ 15    At the close of Lyudmila's testimony, the administrative law judge (ALJ) asked plaintiff how many more witnesses she planned to call. Plaintiff responded that she planned to call her brother and sister-in-law. The ALJ asked plaintiff if she planned to call R.T. Plaintiff responded, "No. I didn't know I could bring her to court." The ALJ then replied, "I would—no. I would discourage that." The ALJ told plaintiff to get her next witness on the phone. Plaintiff was prepared to call her brother. Before plaintiff could call him, the Department objected to the extent that the witnesses' testimony would be cumulative in nature. The Department offered to stipulate to the witnesses' testimony as it related to plaintiff's character. Plaintiff clarified that neither witness saw the incident and summarized to what the parties would testify. Plaintiff stated that her brother would testify that he was well-acquainted with R.T. He had been on vacations with R.T. and plaintiff, driven R.T. to school, and would help around the house on occasions when plaintiff had ordered furniture for R.T. or when R.T. had damaged property around the house. The Department stipulated to this testimony. The ALJ asked plaintiff if she found it acceptable that the Department would "[accept] that if called to testify, those are the things he would say." Plaintiff did not disagree. Rather, she made a point to add that if her brother was called to testify, he would say that he had talked with R.T. multiple times about her behavior and that R.T. was aware she sometimes acts inappropriately towards her mother. Plaintiff also began giving specific incidents where R.T. had acted inappropriately until the ALJ stopped plaintiff and told her, "Well, you can testify to that

information." Plaintiff's only other witness was her sister-in-law. The ALJ then asked plaintiff what her sister-in-law would testify to. Plaintiff responded that her sister-in-law would testify to "pretty much" the same as her brother. The Department stipulated.

¶ 16    Plaintiff testified last. Plaintiff's testimony detailed her relationship with R.T. Plaintiff described how she felt an immediate connection with R.T. the first time the two met. Plaintiff provided evidence of the coursework she completed on trauma, attachment, and other parenting topics before and after the adoption took place. She also described that R.T. had gone through periods where her behavior escalated—for example, R.T. struggled with the start of seventh grade, as it was difficult for her to have a different teacher for each class. The COVID-19 pandemic also caused an escalation in R.T.'s behavior, as she was stuck at home and blamed her mother. Plaintiff sought outside assistance for R.T.'s behavior at this time. She contacted the Buffalo Grove Police Department social worker for referrals and went to a few places with available services. However, she encountered issues involving insurance and driving distances. Plaintiff and R.T. received help from the Behavioral Services Center for a time. They were then referred to Metropolitan Family Services, but there was a long wait for intake. Other recommended programs would not work with plaintiff's insurance. When R.T.'s school year did not begin in person in the autumn of 2020, her behavior continued to escalate to the point where the incident on September 24 occurred.

¶ 17    Plaintiff testified that on the night of September 24, it was late, and she could not get R.T. to go to bed. R.T. "was completely oppositional" that night, so plaintiff took R.T.'s iPad. This caused R.T. to begin cursing, yelling, and screaming. When R.T. tried to get close to and take away the iPad from plaintiff, plaintiff "just slapped [R.T.] to get her away *** and to stop her hysterics." The slap caused R.T.'s semi-rimless glasses to leave a scratch on her face but did not actually break the glasses. Plaintiff claimed that there was no evidence of bruises or redness on

R.T.'s cheek and that the investigative report contained a lot of things that were manipulated or misinterpreted. Plaintiff added that after she slapped R.T., R.T. was able to "stop her hysterics" and the two talked before R.T. went to bed. Before her therapy session on the afternoon of September 25, 2020, R.T. asked plaintiff if it would be okay to discuss what had happened the night before. Plaintiff told R.T., "Of course." She stated that things had already calmed down by that point. Given the nature of the incident, plaintiff thought that the ensuing report and investigation felt like a misconstruction of what happened. Plaintiff also stated that she had never referred to her daughter as a "psychopath," but referenced that she believed her daughter to have artistic genius and that people with such genius are "a little different."

¶ 18    During the pendency of the investigation, another call was made to the Department's hotline. On October 20, 2020, plaintiff and R.T. got into an argument. R.T. was holding her iPad, lost her temper, and threw her hands in the air, accidentally striking plaintiff with the iPad. Plaintiff called the police and the police called paramedics because a knot was beginning to form on plaintiff's head. Plaintiff said she did not want to press charges. She only wanted the police to talk to R.T. about her attitude.

¶ 19    The ALJ concluded that the Department met its burden in proving allegation number 10, substantial risk of physical injury, and allegation number 11, cuts, bruises, welts, abrasions and oral injuries. The Director upheld these findings. Plaintiff then filed a complaint for administrative review in the circuit court of Lake County. Plaintiff argued that the indicated findings should be reversed because: (1) the findings of fact made by the ALJ were against the manifest weight of the evidence, (2) the final administrative hearing was erroneous as a matter of law, and (3) the indicated findings were maintained in violation of plaintiff's due process rights. In her memorandum in support of the complaint for administrative review, plaintiff argued that her due

process rights were violated because the ALJ wrongfully sustained objections to hearsay and the testimony of witnesses on the basis that it was cumulative. The circuit court ruled that the indicated finding of allegation number10 was against the manifest weight of the evidence because the evidence in the record did not support a finding that plaintiff's conduct caused R.T. "an impairment of physical, mental, or emotional health," or a risk of death or disfigurement. The circuit court did rule, however, that the ALJ's finding as to allegation number 11 was not against the manifest weight of the evidence because the facts were undisputed that plaintiff slapped her daughter and the slap resulted in a cut on her daughter's nose. Plaintiff filed a motion to reconsider the circuit court's ruling on allegation of harm number 11. She argued, as relevant to this appeal, that she brought family members to testify in the administrative hearing and in the circuit court, and they were denied the opportunity to testify. Plaintiff's motion to reconsider was denied. Plaintiff thereafter filed a timely notice of appeal.

¶ 20                                    II. ANALYSIS

¶ 21    On appeal, plaintiff argues that: (1) the Director's decision not to expunge the indicated finding was clearly erroneous, (2) she was prejudiced by the ALJ's treatment of live testimony and letters, and (3) her due process rights were violated.

¶ 22    Under the Abused and Neglected Child Reporting Act (Act), (325 ILCS 5/1 *et seq.* (West 2020)), the Department maintains a central register of all reported cases of suspected child abuse or neglect. 325 ILCS 5/7.7 (West 2020). When the Department investigates a report of abuse or neglect, it must determine whether the report is "indicated," "unfounded," or "undetermined." 325 ILCS 5/7.12 (West 2020). A report is "indicated" if "an investigation determines that credible evidence of the alleged abuse or neglect exists." 325 ILCS 5/3 (West 2020). An indicated report must be entered in the central register. 325 ILCS 5/7.12 (West 2020).

¶ 23    An individual subject to an indicated report has the right to an administrative appeal and to request that the report be expunged. 325 ILCS 5/7.16 (West 2020). The Department must prove that a preponderance of the evidence supports the indicated finding. 89 Ill. Admin. Code 336.115(c)(2)(B) (2020). After the hearing, the ALJ will present a written opinion and recommendation to the Director, who may accept, reject, amend or return the recommendation. 89 Ill. Admin. Code 336.120(b)(15) (2020); 89 Ill. Admin. Code 336.220(a)(1) (2020). The Director's decision is the final administrative decision. 325 ILCS 5/11.6 (West 2020). Jurisdiction to review final administrative decisions is vested in the circuit court. 735 ILCS 5/3-104 (West 2020). This court reviews the decision of the administrative agency, not the trial court's decision. *Bolger v. Department of Children & Family Services*, 399 Ill. App. 3d 437, 448 (2010).

¶ 24    Here, plaintiff appeals the Director's decision not to expunge the indicated finding of allegation number 11, causing cuts, bruises, welts, abrasions, and oral injury. An "abused child" is defined in relevant part as a child whose parent "inflicts, causes to be inflicted, or allows to be inflicted upon such child physical injury, by other than accidental means, which causes death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function," "creates a substantial risk of physical or mental injury to such child by other than accidental means which would be likely to cause death, disfigurement, impairment of physical or emotional health, or loss of impairment or any bodily function," or "inflicts excessive corporal punishment." 325 ILCS 5/3 (West 2020). Disfigurement "means a serious or protracted blemish, scar, or deformity that spoils a person's appearance or limits bodily functions." 89 Ill. Admin. Code 300.20 (2020).

¶ 25    An administrative agency's findings and conclusions on questions of fact are deemed *prima facie* true and correct. *Bolger*, 399 Ill. App. 3d at 448 (quoting *Cinkus v. Village of Stickney*

*Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008)). The reviewing court is limited to determining whether the agency's findings of fact are against the manifest weight of the evidence. *Bolger*, 399 Ill. App. 3d at 448. A decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Id*. However, an agency's decision on a question of law is not binding on a reviewing court and is reviewed *de novo*. *Id*.; *see also City of Belvidere v. Illinois State Labor Relations Board,* 181 Ill. 2d 191, 205 (1998). Mixed questions of law and fact are reviewed under a "clearly erroneous" standard. *Bolger*, 399 Ill. App. 3d at 448. An agency's decision is clearly erroneous when the reviewing court is left with the "definite and firm conviction that a mistake has been committed. [Citations.]" *Id.* \

¶ 26    Allegation number 11 is proven by a showing, as relevant here, that there was a cut, bruise, or abrasion to the child. 89 Ill. Admin. Code 300, Appendix B (eff. April 21, 2017). A cut is defined as "an opening, incision, or break in the skin made by some external agent." *Id.* A bruise "is an injury that results in bleeding under the skin, in which the skin is discolored but not broken." *Id.* An abrasion is "the scraping away of the skin." *Id.* Under allegation number 11 there are "factors to be considered," with an explanation that "not every cut, bruise, welt, abrasion, or oral injury constitutes an allegation of harm," and that various factors should be considered when determining whether an injury that resulted in a cut, bruise, welt, abrasion, or oral injury constitutes an allegation of abuse. *Id.* As relevant to this appeal, the factors include:

- The child's age, mobility and developmental stage;
- The child's medical condition, behavioral, mental, or emotional problems, developmental disability, or physical handicap, particularly as they relate to the child's ability to seek help;
- A single incident or pattern or chronicity of similar events;

- The severity/extent of the cuts, bruises, welts, abrasions, or oral injuries;

- Whether the injury was caused by an instrument used on the child; and

- Previous history of indicated abuse or neglect, or history of previous injuries. *Id.*

In this case, the child was over 14 years old, with no physical issues of record. Plaintiff hit her daughter with an open hand, causing R.T.'s glasses to cut her nose. There was testimony that there have been prior incidents of aggression, initiated by both mother and daughter, although there is no previous history of indicated abuse or neglect. However, R.T. has a history of trauma and mental issues, including a diagnosis of oppositional defiant disorder. The ALJ pointed out that plaintiff had specialized training and knowledge in deescalating aggressive situations but failed to use that knowledge.

¶ 27    Based on the foregoing facts, the ALJ correctly determined that the Department showed by a preponderance of the evidence that plaintiff's act of slapping R.T. aligned with the specific harm defined in allegation number 11. However, our inquiry does not stop there. The fact that the slap met the criteria outlined in allegation number 11 is only the first step in determining whether to indicate a finding of abuse. "Since appendix B references section 3 of the Act, these provisions are not meant to be read in isolation, but are meant to be read together." *Shilvock-Cinefro v. Department of Children & Family Services,* 2014 IL App (2d) 130042, ¶ 29. Thus, "it is apparent that the plain and ordinary meaning of appendix B and section 3 shows that an indicated finding of abuse should be made where there is a specific harm as described in appendix B that results in abuse as described in section 3 of the Act." *Id.* This means that it is not enough to find that an allegation of harm is proven; rather, the provisions of the Act must be met as well. *Id.*

¶ 28    "Issues concerning abuse and neglect are decided on a case-by-case basis because abuse and neglect findings rely on amorphous concepts that are difficult to define with particularity." *Id.*

¶ 25. See also *Slater v. Department of Children & Family Services*, 2011 IL App (1st) 102914, ¶ 36. While there is relatively little case law exploring the definitions and how the Code relates to the Act, this court has examined cases that provide some guidance. *Shilvock-Cinefro*, 2014 IL App (2d) 130042, ¶ 25.

¶ 29   In *Korunka v. Department of Children & Family Services*, 259 Ill. App. 3d 527 (1994), the reviewing court expunged a finding of abuse when a teacher grabbed a student who had been exhibiting bad behavior and left a bruise on the student. The Department indicated the finding because the teacher "had exceeded the proper limits of discipline and had acted contrary to school policy regarding physical discipline." *Id.* at 530. The reviewing court determined that the finding of abuse was against the manifest weight of the evidence because not every bruise results in a finding of harm, and this act was not "excessive" corporal punishment. *Id.* at 532. In reaching its decision, the court noted that "inappropriate behavior does not necessarily amount to abuse." *Id.* In *Lyons v. Department of Children & Family Services*, 368 Ill. App. 3d 557, 561 (2006), the reviewing court found that a teacher's assistant's act of taking a behaviorally disordered student to the floor, causing a bump on the student's head, was not abuse, even though the decision to use that method was not correct.

¶ 30   Here, there is support for the contention that the incident meets the specific harm of allegation number 11. However, there was insufficient evidence to determine that the specific act of harm resulted in the abuse defined in section 3 of the Act, *i.e.*, that this act of harm would "be likely to cause death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function." 325 ILCS 5/3(b). The ALJ found that the act of harm constituted abuse defined as defined in Section 3 of the Act because the physical altercations between plaintiff and R.T. put R.T. at a substantial risk for physical injury. The ALJ's opinion

says this is because plaintiff is taller and heavier than R.T. and because the face is an especially vulnerable part of the body. While it is extremely concerning that plaintiff would slap her 14-year-old daughter in the face, we cannot find that this slap, which left a small scratch on the nose, "would be likely to cause death, disfigurement, impairment of physical or emotional health, or loss of impairment of any bodily function." 325 ILCS 5/3(b) (West 2020). Additionally, though plaintiff may be larger than R.T., it does not necessarily follow that this puts R.T. at a substantial risk of substantial injury. When plaintiff and R.T. got into an argument in October, R.T. injured plaintiff, leaving plaintiff with knot on the head. While there was testimony that R.T. experienced emotional distress after the slap, and that someone with her diagnosis should not be disciplined physically, the evidence in this case does not support a conclusion that a slap could cause impairment of emotional health. The night after the incident, R.T. told Wojs that she felt safe at home. The Department's notes state that R.T. denied being afraid of plaintiff and the Department assessed R.T. as safe. Further, this was not excessive corporal punishment. Plaintiff took away R.T.'s iPad as punishment; the slap was an inappropriate method of deescalating the R.T.'s physical aggression in response to the punishment. Although plaintiff should have handled the situation differently, "inappropriate behavior does not necessarily amount to abuse." *Korunka*, 259 Ill. App. 3d 527 at 530.

¶ 31    Because the incident from September 24 did not create a substantial risk that R.T. would suffer an injury likely to cause death, disfigurement, impairment of physical or emotional health, or loss of impairment or any bodily function, R.T. denied feeling unsafe, and the Department assessed R.T. as safe with plaintiff, we find that the provisions of the Act read together do not support an indicated finding of abuse. Accordingly, we reverse.

¶ 32    On appeal, plaintiff also argues that the ALJ improperly weighed the evidence she presented. Specifically, she argues that the ALJ did not properly consider the letters she admitted into evidence and her due process rights were violated when the ALJ did not give R.T. a chance to testify. However, in light of our disposition on the first issue, we need not address the other issues plaintiff raises.

¶ 33                            III. CONCLUSION

¶ 34    For the reasons stated above, we reverse the judgment of the circuit court of Lake County affirming the denial of plaintiff's request for expungement.