# Illinois Official Reports

## Appellate Court

> ### *L.F. v. Department of Children & Family Services*,
> ### 2015 IL App (2d) 131037

| | |
|---|---|
| Appellate Court Caption | L.F., Plaintiff-Appellant, v. THE DEPARTMENT OF CHILDREN AND FAMILY SERVICES and RICHARD H. CALICA, as Director of Children and Family Services, Defendants-Appellees. |
| District & No. | Second District<br>Docket No. 2-13-1037 |
| Filed | March 11, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 12-MR-1538; the Hon. Christopher C. Starck, Judge, presiding. |
| Judgment | Reversed with directions. |
| Counsel on Appeal | Alyssa E. Ramirez, of Winston & Strawn LLP, of Chicago, for appellant.<br><br>Lisa Madigan, Attorney General, of Chicago (Carolyn E. Shapiro, Solicitor General, and Laura A. Ward, Assistant Attorney General, of counsel), for appellees. |

| Panel | JUSTICE BURKE delivered the judgment of the court, with opinion. Justices Hutchinson and Birkett concurred in the judgment and opinion. |

**OPINION**

¶ 1        After the Department of Children and Family Services (DCFS) entered against plaintiff, L.F., an indicated finding of child neglect due to inadequate supervision (89 Ill. Adm. Code 300.Appendix B (Allegation 74), amended at 35 Ill. Reg. 2861 (eff. Feb. 8, 2011)), she administratively appealed the finding and requested that it be expunged from the state central register. Following an evidentiary hearing, the administrative law judge (ALJ) recommended to deny the expungement request. Defendant Richard H. Calica, as Director of DCFS (Director), agreed and denied plaintiff's expungement request. The circuit court of Lake County affirmed the Director's decision. Plaintiff timely appeals from that order. For the following reasons, we reverse the trial court's decision and order the Director to expunge the indicated finding from the state central register.

¶ 2                                      I. FACTS

¶ 3                                    A. Background

¶ 4        The record reveals the following undisputed facts and procedural history. Plaintiff is the single parent of S.H., who was born July 27, 2006. Plaintiff and S.H. lived in a two-bedroom apartment in Round Lake Beach, Illinois.

¶ 5        In 2009, plaintiff was diagnosed with a dependency on drugs and alcohol. She received inpatient and outpatient treatment for her dependency, attended Alcoholics Anonymous (AA) meetings, and met with a sponsor. Plaintiff also received psychiatric treatment from Dr. Katherine Singer for depression, anxiety, obsessive-compulsive disorder, and dermatillomania–a condition that caused her to obsessively pick at her skin.

¶ 6        Plaintiff also began therapy with Nancy Friedman, a licensed professional counselor. Friedman diagnosed her with and treated her for an anxiety disorder, other psychological conditions, and substance abuse. Plaintiff met with Friedman weekly in 2011.

¶ 7        On July 3, 2011, while camping with friends, plaintiff was injured in a fall, suffering a hematoma to her tailbone. Plaintiff was prescribed Tylenol with codeine. Plaintiff only took the medicine briefly because it made her sleepy. She asked her mother, Carol M., to care for S.H. while she was taking the Tylenol with codeine, but her mother refused.

¶ 8        After her mother refused, plaintiff stopped taking the Tylenol with codeine and switched to smoking "K3," which was considered to be legal synthetic marijuana at the time. She testified at the administrative hearing that K3 gave her a feeling similar to a marijuana "high," making her feel relaxed and "happy." The first time she smoked K3, her son was with a friend of hers. Plaintiff testified that she smoked K3 again a few days later but that she could not recall whether S.H. was at a friend's house or asleep in plaintiff's apartment. She began smoking K3 on a nightly basis, and in total she smoked K3 between 10 and 20 times.

During those times, S.H. was either asleep at home or with a friend, but she could not remember which of those times S.H. was with her.

¶ 9    Plaintiff became concerned that she was addicted to K3. During an alcohol and substance abuse assessment, she told the evaluator that up to five days before the evaluation she was smoking two grams of K3 daily.

¶ 10    On August 5, 2011, plaintiff sought help from her friends George Kinser and Natalie Brooks at an AA meeting. Kinser was plaintiff's AA sponsor. Brooks had been her sponsor but had not seen her for at least two months, because plaintiff had no longer desired to work on her 12-step program. Brooks had "detached" from plaintiff when plaintiff decided to "go back out." Brooks knew that plaintiff was seeking help for a substance abuse problem, because, after Brooks broke things off, they both knew that Brooks was not allowed to talk to her unless she wanted help.

¶ 11    Plaintiff told Kinser and Brooks that she was smoking K3 and wanted help to stop, because she was experiencing withdrawal symptoms. Kinser and Brooks agreed to help plaintiff. Kinser agreed to keep S.H. while Brooks took plaintiff to the Highland Park Hospital emergency room. Plaintiff admitted to smoking K3 on the way to the hospital.

¶ 12    The hospital records indicate that plaintiff told hospital staff that she wished to "detox" from alcohol and K3. Plaintiff told staff that she was drinking in excess of 10 shots per day and that she was shaking and had diarrhea from attempting to withdraw from K3. The hospital's toxicology screen of plaintiff came back negative.

¶ 13    The next morning, while waiting to transfer to a treatment center, plaintiff had an anxiety attack. She left the hospital despite advice to stay. Plaintiff called Friedman and told her of the panic attack. Friedman advised her to return to the hospital.

¶ 14    Plaintiff also called Kinser, who was concerned that she would continue to use K3. He refused to pick her up from the hospital. He thought that it would be in plaintiff's best interest if she stayed at the hospital. Plaintiff began walking to Kinser's home, which was about 15 miles away.

¶ 15    After he spoke with plaintiff, Kinser called Carol M. and told her that plaintiff was on the way to his house, because she had left treatment prematurely. He told Carol M. that he did not want S.H. to be at his house when plaintiff arrived. Kinser is a school teacher and a mandated child-abuse reporter and he was afraid that he would have to call DCFS if plaintiff showed up while under the influence and S.H. was still there. Carol M. agreed to have S.H. stay with her, and Brooks drove him to Carol M.'s house.

¶ 16    Police officers saw plaintiff as she walked away from the hospital and they took her to Kinser's home. When plaintiff discovered that S.H. was not there, she drove to Carol M.'s house. Carol M. offered to care for S.H. while plaintiff received assistance for her substance abuse problems and plaintiff became angry and refused.

¶ 17    Carol M. called the police before plaintiff arrived, because she thought that it was not safe for S.H. to be with plaintiff when plaintiff was so agitated. Carol M. also called Sandra Blank, a DCFS supervisor, for advice on what to do. Blank had been Carol M.'s supervisor when Carol M. worked for DCFS in the same office that conducted the investigation of plaintiff.

¶ 18    When plaintiff arrived at Carol M.'s home, she saw the police officers. Plaintiff became very upset when Carol M. accused her of being drunk and refused to release S.H. to her. The

police officers tested plaintiff for alcohol, and the test came back negative. Carol M. still refused to allow S.H. to leave with plaintiff. Plaintiff yelled, threw her cell phone, and then drove away. She experienced an anxiety attack but, after speaking with an officer and being checked by paramedics, she agreed to leave S.H. with her mother for the night.

¶ 19        On August 6, 2011, the DCFS hotline received a call from Carol M. regarding suspected child abuse or neglect on August 6, 2011. Marianne Zimmer took the call and Jane Postlewait, a child protection investigator, was assigned to investigate.

¶ 20        Postlewait interviewed S.H. at Carol M.'s home. He appeared healthy, clean, and well-dressed. He complained only that his mother kissed him too much and would not allow him to play outside by himself. Postlewait also observed plaintiff and S.H. together. She noted that plaintiff was very supportive and had positive interactions with S.H. She also went to plaintiff's apartment and reported it as clean, neat, and adequately furnished.

¶ 21        Postlewait interviewed plaintiff, who admitted to having a history of substance abuse and to smoking K3, relapsing, and leaving the hospital against advice to stay. Plaintiff told Postlewait that K3 had similar effects to marijuana.

¶ 22        Plaintiff signed a safety plan, in which she agreed to take part in a drug-treatment program while S.H. remained at Carol M.'s house. A week later, plaintiff tested negative for drugs and the safety plan was dismissed.

¶ 23        Postlewait received a report from S.H.'s primary-care physician that he was healthy and a report from his school that he was doing well in school. Postlewait also learned that plaintiff had been a victim of child abuse in 2004 and a victim of domestic violence. Postlewait also discovered that plaintiff's paramour had been indicated for child abuse in 2010 for hitting, kicking, and choking plaintiff when S.H. was present and for encouraging S.H. to participate in the domestic violence.

¶ 24        At the conclusion of her investigation, Postlewait recommended entering against plaintiff an indicated finding under Allegation 60, titled "Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect." 89 Ill. Adm. Code 300.Appendix B (Allegation 60), amended at 35 Ill. Reg. 2861 (eff. Feb. 8, 2011). Postlewait did not recommend an indicated finding under Allegation 74.

¶ 25        DCFS notified plaintiff that it was indicating her under Allegation 60 and that the report would be retained in the state central register. Plaintiff requested an appeal of the indicated finding on October 19, 2011, and requested a hearing within DCFS's administrative hearings unit. On January 23, 2012, DCFS notified plaintiff that it was amending its allegations against her to add an indicated finding under Allegation 74.

¶ 26                                B. July 9, 2012, Administrative Hearing

¶ 27        On July 9, 2012, the ALJ presided over the hearing on plaintiff's appeal, which encompassed a challenge to both indicated findings.

¶ 28        Plaintiff testified that she successfully obtained sobriety on April 20, 2009, but acknowledged that she used K3 for a short period of time in July and August 2011, while S.H. was asleep. When asked how smoking K3 affected her, plaintiff replied, "[i]t's similar to a marijuana high so you get relaxed and like happy, but I'm still coherent and can function."

¶ 29    Plaintiff testified that she does everything for S.H. She makes sure he is clean and dressed, has clean clothes, and gets to school. She picks up S.H. from school in Libertyville. S.H. attended a Montessori school during the 2010-11 school year, which cost plaintiff $11,000, even though her income was only $13,000. Plaintiff sent him to an expensive school because he was at an important stage of development and she wanted him to have a good start.

¶ 30    Carol M. testified that, by July 2011, plaintiff was showing signs of a relapse. Carol M. reported that plaintiff had been making fewer phone calls, had been cutting and scratching herself, and had quit her job.

¶ 31    Carol M. and plaintiff signed a safety plan in which plaintiff agreed to undergo drug treatment while S.H. remained with Carol M. for one week. The plan was dismissed a week later when plaintiff completed all the requirements and tested negative for drugs.

¶ 32    Carol M. further admitted that, in July 2011, while she believed that plaintiff was using drugs again, she allowed her 14-year-old son to stay overnight at plaintiff's home. She also acknowledged that she had worked at the same DCFS office that investigated plaintiff. Carol M. had called Blank to discuss her legal right to keep S.H., because she was worried that plaintiff would take S.H. away from her and never let her see him again.

¶ 33    Carol M. testified that, in the months prior to August 2011, plaintiff was "doing a great job" at "being a single mother." In August 2011, Carol M. noticed that plaintiff had less contact with her family, her housekeeping dwindled, and S.H. seemed needier than usual. Because of this, Carol M. stated, she believed that plaintiff was using drugs again. She admitted that although she had her suspicions she could not prove it at that point.

¶ 34    Postlewait testified that she saw no signs of abuse or neglect of S.H. She stated that S.H. was "dressed appropriately, clean, [and had] no unusual marks or bruises." She further stated that "mom and S.H. *** have a positive relationship, positive interaction. He is not fearful of her. And [plaintiff] was concerned about her son's safety."

¶ 35    During cross-examination, Postlewait could not pinpoint a date on which plaintiff was under the influence of K3 while S.H. was in her custody. However, she stated that plaintiff admitted to using K3 in July and August 2011, and she inferred that, because plaintiff is S.H.'s primary caretaker, there must have been a time when plaintiff was under the influence of K3 while supervising S.H.

¶ 36    Friedman testified that she saw plaintiff weekly and that S.H. attended about 30% of the sessions. Regarding the July and August 2011 sessions, Friedman testified that plaintiff was very engaged with S.H. Friedman noted that plaintiff had motivation for positive change, healthy parenting, and healthy behavior. Friedman further stated that plaintiff manifested some tremendously healthy parenting behaviors. When asked if she noticed a change in plaintiff's mood during July and August 2011, Friedman responded that she remembered plaintiff feeling a little bit down. "But *** it wasn't a crisis." Friedman further stated that S.H. appeared happy, well adjusted, and cooperative and that he was a very healthy child. When asked if she considered calling DCFS during July or August 2011, Friedman, who is a mandated child-abuse reporter, responded: "Absolutely not." Friedman stated that K3 is an "intoxicant" but said that she knew little else about it.

¶ 37    Blank testified that she received a phone call from Carol M. on August 6, 2011, because Carol M. was concerned that plaintiff was using drugs. Blank was familiar with this issue

because she was aware of plaintiff's history of substance abuse. Blank had no other involvement with the investigation of plaintiff.

¶ 38 Kinser and Brooks testified that they were plaintiff's AA sponsors. Brooks stated that she told plaintiff to exaggerate her drug and alcohol use in order to be permitted to detox at the hospital. She further testified that plaintiff was a really good mother and did anything and everything she could for S.H. and his well-being. Kinser testified that, when plaintiff arrived at the AA meeting on August 5, 2011, she did not appear to be under the influence. He further stated that after learning that plaintiff left the hospital on August 6, 2011, he called Carol M. because he is a mandated child-abuse reporter and was concerned that he might have to make a report. However, when plaintiff arrived at his house later that morning, Kinser did not feel that he would have needed to call DCFS.

¶ 39 On August 17, 2012, the ALJ issued her recommendation to deny expungement of the indicated findings of neglect due to an injurious environment (Allegation 60) and inadequate supervision (Allegation 74). As to Allegation 74, she concluded that DCFS carried its burden of proving by a preponderance of the evidence that plaintiff had "inadequately supervised her son when she was [his] primary caregiver, [because she] had a history of mood disorder and substance abuse, relapsed, and admitted smoking K3 on a daily basis, including occasions while her son slept in their apartment." The Director adopted the ALJ's recommendation as his final decision and denied plaintiff's request to expunge the indicated findings.

¶ 40 On September 25, 2012, plaintiff filed a complaint in the trial court for administrative review of the Director's decision denying her request to expunge the indicated findings of neglect. On January 22, 2013, the administrative-review action was stayed pending resolution of *Julie Q. v. Department of Children & Family Services*, 2013 IL 113783. As a result of the supreme court's decision in *Julie Q.*, the indicated finding of neglect due to an injurious environment (Allegation 60) was expunged from the record. On September 10, 2013, the trial court affirmed the Director's decision to deny plaintiff's request to expunge the indicated finding of neglect due to inadequate supervision (Allegation 74). This timely appeal followed.

¶ 41                                     II. ANALYSIS

¶ 42 Plaintiff raises several arguments on appeal, including that (1) DCFS erred in denying plaintiff's request to expunge the indicated finding of inadequate supervision; and (2) the administrative decision is void because DCFS lacked the statutory authority to indicate plaintiff for inadequate supervision. Because we find that DCFS's indicated finding was clearly erroneous, we need not address any of plaintiff's other arguments.

¶ 43 Under the Abused and Neglected Child Reporting Act (Reporting Act) (325 ILCS 5/1 *et seq*. (West 2010)), DCFS maintains a central register of all reported cases of suspected child abuse or neglect. 325 ILCS 5/7.7 (West 2010); *Shilvock-Cinefro v. Department of Children & Family Services*, 2014 IL App (2d) 130042, ¶ 20. DCFS operates a 24-hour telephone hotline for reports of suspected abuse or neglect. 89 Ill. Adm. Code 300.30(a), amended at 35 Ill. Reg. 2861 (eff. Feb. 8, 2011). When DCFS investigates a report of neglect, it must determine whether the report is "indicated," "unfounded," or "undetermined." 325 ILCS 5/7.12 (West 2010).

¶ 44    A report is indicated "if an investigation determines that credible evidence of the alleged abuse or neglect exists." 325 ILCS 5/3 (West 2010); *Shilvock-Cinefro*, 2014 IL App (2d) 130042, ¶ 20. Credible evidence of abuse or neglect exists whenever "the available facts, *** viewed in light of surrounding circumstances, would cause a reasonable person to believe that a child was abused or neglected." 89 Ill. Adm. Code 336.20 (2005). An indicated report must be entered on the State central register, where it will remain for a minimum of five years. *Julie Q. v. Department of Children & Family Services*, 2011 IL App (2d) 100643, ¶ 29, *aff'd*, 2013 IL 113783.

¶ 45    The subject of an indicated report has the right to an administrative appeal and to request that the report be expunged. 325 ILCS 5/7.16 (West 2010); 89 Ill. Adm. Code 336.40, 336.50, 336.60 (2000); *Bolger v. Department of Children & Family Services*, 399 Ill. App. 3d 437, 447 (2010). DCFS bears the burden of proof in justifying its refusal to expunge the indicated report and must prove that a preponderance of the evidence supports the indicated finding. 89 Ill. Adm. Code 336.100(e) (2000); *Shilvock-Cinefro*, 2014 IL App (2d) 130042, ¶ 21. Following the hearing, the ALJ makes a recommendation to DCFS's Director, who may accept, reject, amend, or return the recommendation. 89 Ill. Adm. Code 336.220(a) (2005); *Slater v. Department of Children & Family Services*, 2011 IL App (1st) 102914, ¶ 24. The Director's decision is the final administrative decision. 89 Ill. Adm. Code 336.220(a) (2005); *Shilvock-Cinefro*, 2014 IL App (2d) 130042, ¶ 21.

¶ 46    Judicial review of the Director's decision is governed by the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2010)). Jurisdiction to review a final administrative decision is vested in the trial court, from which a party may appeal to this court. 735 ILCS 5/3-104, 3-112 (West 2010). As in all cases of administrative review, it is the decision of the agency, not the determination of the trial court, that is the subject of our review. *Bolger v. Department of Children & Family Services*, 399 Ill. App. 3d 437, 448 (2010).

¶ 47    On administrative review, the applicable standard of review depends on whether the question presented is one of fact, one of law, or a mixed question of fact and law. *Id.* "An administrative agency's findings and conclusions on questions of fact are deemed *prima facie* true and correct." *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008). A reviewing court is limited to determining whether the agency's findings of fact are against the manifest weight of the evidence. *Id.* An agency's decision is against the manifest weight of the evidence "only if the opposite conclusion is clearly evident." *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992). "If there is anything in the record which fairly supports the agency's decision, such decision is not against the manifest weight of the evidence and must be sustained on review." *Grams v. Ryan*, 263 Ill. App. 3d 390, 396 (1994).

¶ 48    In contrast, an agency's decision on a question of law is not binding on a reviewing court and is reviewed *de novo*. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998). When a case involves an examination of the legal effect of a given set of facts, it involves a mixed question of fact and law. *Id.* Mixed questions of fact and law are reviewed under the "clearly erroneous" standard. *Cinkus*, 228 Ill. 2d at 211; *Shilvock-Cinefro*, 2014 IL App (2d) 130042, ¶ 23. The agency's decision will be deemed clearly erroneous "only where the reviewing court, on the entire record, is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Id.* "The clearly erroneous standard of review affords more deference to the agency

than *de novo* review but less deference than manifest weight review. Therefore, applying the clearly erroneous standard to mixed questions yields some deference to administrative expertise." *Du Page County Airport Authority v. Department of Revenue*, 358 Ill. App. 3d 476, 482 (2005). In the present case, determining whether DCFS erred in denying plaintiff's request to expunge the indicated finding of inadequate supervision involves determining whether the facts satisfy the agency's legal standard for inadequate supervision. Accordingly, the DCFS determination is reviewed under the "clearly erroneous" standard.

¶ 49    The Reporting Act defines a neglected child as one who is not receiving the "care necessary for his or her well-being." 325 ILCS 5/3 (West 2010); *Slater*, 2011 IL App (1st) 102914, ¶ 39. Appendix B of DCFS's regulations delineates specific allegations of harm sufficient to trigger an investigation of reported child neglect. 89 Ill. Adm. Code 300.Appendix B, amended at 35 Ill. Reg. 2861 (eff. Feb. 8, 2011). "Inadequate supervision" occurs when a "child has been placed in a situation or circumstances that are likely to require judgment or actions greater than the child's level of maturity, physical condition, and/or mental abilities would reasonably dictate." 89 Ill. Adm. Code 300.Appendix B (Allegation 74), amended at 35 Ill. Reg. 2861 (eff. Feb. 8, 2011). Allegation 74 includes a nonexhaustive list of examples of inadequate supervision. Relevant to the present case is the example of the caregiver being present but unable to supervise because of the caregiver's condition, which includes (a) where the parent or caregiver repeatedly uses drugs or alcohol to the extent that it has the effect of producing a substantial state of stupor, unconsciousness, intoxication, or irrationality, and (b) where the parent or caregiver cannot adequately supervise because of his or her medical condition or behavioral, mental, or emotional problems. 89 Ill. Adm. Code 300.Appendix B (Allegation 74), amended at 35 Ill. Reg. 2861 (eff. Feb. 8, 2011).

¶ 50    Allegation 74 further provides factors to be considered, which are categorized into "child," "caregiver," and "incident" factors. Child factors include "[t]he child's age and developmental stage, particularly related to the ability to make sound judgments in the event of an emergency" and "[t]he child's physical condition, particularly related to the child's ability to care for or protect himself." *Id.* Caregiver factors consist of the amount of time it takes the caregiver to reach the child, whether the caregiver can see or hear the child, and the caregiver's maturity, physical condition, emotional condition, and cognitive ability to make appropriate judgments on the child's behalf. Incident factors include the frequency and duration of the occurrence, whether it occurs in the day or night, whether there are other people overseeing the child, and whether there are any "other factors that may endanger the health and safety of the child." *Id*.

¶ 51    The basis for DCFS's indicated finding against plaintiff was that she "inadequately supervised her son when she was the primary caregiver [and that she] had a history of mood disorder and substance abuse, relapsed, admitted smoking K3 on a daily basis, including occasions while her son slept in their apartment." DCFS points to the following evidence in support of the ALJ's conclusion that plaintiff inadequately supervised her son: (1) plaintiff used K3 daily for approximately two weeks while S.H. was either asleep at home or at someone else's home; (2) plaintiff admitted that her use of K3 made her high, similar to the effects of marijuana; (3) Friedman testified that K3 is an "intoxicant" and that plaintiff was "sensitive" to such chemicals; (4) plaintiff sought help to detoxify and to stop using K3, yet she checked out of the hospital against medical advice; and (5) despite testifying that S.H. sometimes stayed with plaintiff's friends or with plaintiff's mother when plaintiff used K3,

plaintiff did not deny that S.H. was in her custody at least some of the times when she was high on K3. The ALJ essentially adopted DCFS's findings in her determination that plaintiff inadequately supervised S.H. when she was the primary caregiver.

¶ 52 The question before us is whether, based on the application of the law to these undisputed facts, DCFS's decision was clearly erroneous. Pursuant to Allegation 74, DCFS was tasked with presenting evidence to show that plaintiff had placed S.H. "in a situation or circumstances that [were] likely to require judgment or actions greater than the child's level of maturity, physical condition, and/or mental abilities would reasonably dictate" and that such circumstances existed because she repeatedly used K3 to the extent that it had the effect of producing a substantial state of stupor, unconsciousness, intoxication, or irrationality. 89 Ill. Adm. Code 300.Appendix B (Allegation 74), amended at 35 Ill. Reg. 2861 (eff. Feb. 8, 2011).

¶ 53 We find that DCFS did not meet its burden of proof. DCFS did not provide any evidence that plaintiff's use of K3 produced a substantial state of stupor, unconsciousness, or irrationality such that she placed S.H. in a situation that would likely require judgment or actions greater than his level of maturity. Plaintiff's testimony that her use of K3 made her "high" and that it was "similar to marijuana" did not establish a basis to conclude that this use resulted in a state such that plaintiff could not adequately supervise S.H. DCFS never introduced any evidence on the chemical effects of K3 and whether it causes an individual to become unconscious, irrational, or in a state of stupor such that the individual is unable to adequately care for a child. When asked about the effects of K3, plaintiff testified that she could still function after using it. While the ALJ was free to disbelieve plaintiff's testimony, DCFS did not present any evidence to refute it. In fact, the evidence supported it. Plaintiff tested negative for drugs and her safety plan was dismissed. Additionally, neither Friedman nor Kinser, who were mandated child-abuse reporters, felt the need to report plaintiff to DCFS. Furthermore, Carol M. allowed her 14-year-old son to stay overnight at plaintiff's house during the relevant time period.

¶ 54 In sum, there was no evidence that plaintiff's use of K3 rendered her unable to adequately supervise S.H. See *In re N.B.*, 191 Ill. 2d 338, 351 (2000) (in the context of a child-protection proceeding, DCFS must show a nexus between respondent's conduct and the care of the children). Based on the record, we are left with the definite and firm conviction that a mistake has been committed, as DCFS failed to meet its burden by a preponderance of the evidence. Therefore, we find that DCFS's decision to deny expungement of plaintiff's indicated finding of neglect was clearly erroneous.

¶ 55                                III. CONCLUSION

¶ 56 DCFS's decision that plaintiff inadequately supervised S.H. was clearly erroneous. Accordingly, the indicated finding of neglect should be expunged.

¶ 57 Reversed with directions.