2021 IL App (2d) 200782-U
No. 2-20-0782
Order filed December 2, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| ANTHONY J. GRASON, | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 19-MR-766 |
| | ) | |
| ILLINOIS DEPARTMENT OF CHILDREN | ) | |
| AND FAMILY SERVICES; MARC D. | ) | |
| SMITH, Acting Director; and OFFICE OF | ) | |
| ADMINISTRATIVE HEARINGS, | ) | Honorable |
| | ) | Mitchell L. Hoffman, |
| Defendants-Appellees. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Zenoff and Hudson concurred in the judgment.

**ORDER**

¶ 1     *Held*:   (1) Director of DCFS's decision not to expunge indicated finding was not clearly erroneous; (2) court would not review the propriety of DCFS's investigation; (3) plaintiff's due process rights were not violated.

¶ 2     The Illinois Department of Children and Family Services (DCFS) investigated a report that the plaintiff, Anthony Grason, had abused his then 12-year-old son. Following its investigation, DCFS entered an indicated finding of abuse against the plaintiff that he had created a substantial risk of physical injury to his son. The plaintiff thereafter pursued an administrative appeal, seeking

to have the indicated finding expunged from the state central register. The Acting Director of DCFS, Marc Smith, denied the request for expungement, and his decision was affirmed by the circuit court of Lake County. The plaintiff appeals from that order. We affirm.

¶ 3                                             I.  BACKGROUND

¶ 4      The plaintiff and Emily Smith are engaged to be married and have two children. The older child is L.G., who was 12 when the incident at issue occurred. The other child was an infant. The children live with Emily and their grandmother, Penelope Smith, in Round Lake Heights. The plaintiff lives in Decatur and visits Emily and the children frequently on weekends. L.G. has special needs, is in some special education classes, has an Individualized Education Plan (IEP) at school, and is suspected to be on the autism spectrum. One of the characteristics that he exhibits is that he is very possessive of his bedroom and his things. He becomes extremely upset when anyone tries to enter his room or sit in his gaming chair.

¶ 5      On August 27, 2018, while visiting the children, the plaintiff entered L.G.'s bedroom unannounced with gifts he had bought for L.G. His entrance caused L.G. to become very agitated and upset. L.G. attempted to get the plaintiff to leave the room, and he pushed him. The plaintiff left the room and gave the infant child he was carrying to Penelope. The plaintiff returned to L.G.'s room and L.G. again tried to keep him out. The struggle between the plaintiff and L.G. became louder and more physical such that Penelope went upstairs to intervene. She found L.G. in a face-up position on the floor. L.G. was yelling loudly and very upset. Penelope hit the plaintiff with the wooden spoon she was carrying and told him to stop. The plaintiff left and returned to Decatur.

¶ 6      The next day at school, L.G. complained of pain in his side, and reported that his father had kicked, pushed, and hit him. School officials contacted DCFS and the Round Lake Heights

police department.[1]     DCFS Investigator Ayleen Woodard met with L.G. at his school later that day.  He told her that he was in his bedroom when his father entered and would not leave.  L.G. tried to push the plaintiff out of his room, but he refused to go.  L.G. believed that his father was "trying to annoy him."  L.G. stated that the plaintiff got angry and pushed him, causing him to hit his head on his bed, then kicked him in the chest and pushed him into a wall, which made a hole in the wall.  L.G. said that his grandmother then came upstairs and hit the plaintiff with a spoon, which caused the altercation to stop.  Woodard observed an injury to L.G.'s elbow and redness to his ribs.

¶ 7     Later that day, Woodard spoke with Penelope, who described the parts of the altercation she witnessed.  Also, that day, Dr. Antoniou examined L.G. at the hospital.  He did not see any visible injuries but found L.G.'s rib area to be painful on palpation.  He diagnosed a contusion to the area.

¶ 8     On September 7, 2018, Woodard spoke by telephone with the plaintiff.  He stated that "it was all a misunderstanding" and "denied everything" regarding L.G.'s description of the event.  That same day, a DCFS investigator assigned to the Decatur area went to the plaintiff's residence.  The plaintiff declined to participate in a face-to-face meeting, explaining that he had just spoken with Woodard by telephone.  Following this investigation, Woodard and her supervisor determined that the plaintiff would be indicated for having caused a substantial risk of physical injury to L.G.

---

[1] Because Emily did not consent to L.G. being interviewed by the Lake County State's Attorney's Office regarding the incident, the case was not approved for charges, and the police investigation was closed.

Shortly thereafter, the plaintiff filed an appeal with DCFS seeking to have the indicated finding expunged.

¶ 9    On October 26, 2018, L.G. sent a letter to DCFS. He stated that the plaintiff did not kick or abuse him. He also denied telling DCFS or the police that the plaintiff had karate-kicked, choked, or punched him. The statement was witnessed by Emily.

¶ 10    On June 26, 2019, a hearing was held on the plaintiff's administrative appeal. At the hearing, the plaintiff, Woodard, Commander Scott Crawford of the Round Lake Heights police department, Penelope, Emily, and Ronald Grason (the plaintiff's father) testified before an administrative law judge (ALJ). The Round Lake Heights police department's report of the case and the DCFS investigative file was admitted into evidence as well as the written statement that L.G. had sent to DCFS on October 26, 2018. As the plaintiff and Penelope were the only witnesses to the altercation, we summarize only their testimony.

¶ 11    The plaintiff testified that he arrived at the Smith home on August 27, 2018, with clothes and shoes for L.G. Holding the infant, he went upstairs to give L.G. the gifts. L.G.'s bedroom door was slightly open. He walked into the room and put gifts on L.G.'s desk. After L.G. asked, "don't you knock?," the plaintiff apologized. L.G. then shoved and pushed him out the door. The plaintiff fell while holding the infant. He then went downstairs and gave the infant to Penelope. During this time, L.G. was standing outside his room and yelling "Don't you ever knock?" while also using profanity. As L.G. was "banging around," the plaintiff went upstairs to tell him to "knock it off." L.G. then hit him with both hands and pushed him. They fell and L.G. was on top of him. L.G. started head-butting him. The plaintiff got L.G. off him and sat him down on the floor. He put L.G. in a bear hug to calm him down. Penelope then came in waving a wooden

spoon. He told her that he had the situation under control and that he would leave. As he was leaving, L.G. threw the gifts at him and hit him in the head with a shoe.

¶ 12    The plaintiff denied kicking, hitting, choking, or slapping L.G. He explained that he only put his hands on L.G. in self-defense and that his role was only passive. He acknowledged that L.G. had an IEP and that he was working with counselors and social workers at school. He stated that he and Emily had discussed L.G. receiving a psychological evaluation. He acknowledged meeting a DCFS caseworker outside his home but stated that she only gave him a pamphlet and left.

¶ 13    Penelope testified that L.G. gets easily upset and blames everyone else for everything. He does not take social cues and cannot assess situations. He is in some special education classes because he needs help regulating his emotions and socializing with others. He is an introvert and very possessive of his room. He does not allow anyone in to clean his room. He wants to be left alone in there to play games on the computer.

¶ 14    On August 27, 2018, she was in the kitchen making supper. The plaintiff was upstairs with the infant and L.G. The plaintiff came downstairs and said that L.G. had pushed him. That did not surprise her. The plaintiff then went back upstairs. She heard a commotion. She yelled to "knock it off." However, the noise got louder, so she got her wooden spoon and went upstairs. She opened L.G.'s bedroom door and saw L.G. and the plaintiff facing each other in a bear hug on the floor. L.G. was screaming "like a stuck pig." She tapped the plaintiff on the back with a spoon and told him to let L.G. go. She then went downstairs. When the plaintiff came downstairs, she suggested that he leave, and he did. After the incident, she described L.G. as being scared and very emotionally shaken.

¶ 15     At the conclusion of the hearing, the ALJ determined that DCFS had met its burden of establishing that the plaintiff had committed an act of child abuse. The ALJ therefore rejected the plaintiff's request to have the indicated finding expunged from the record. The ALJ explained that it found neither L.G.'s nor the plaintiff's description of the event credible. L.G. exaggerated what happened and the plaintiff's account did not match the evidence (for example, if L.G. had head-butted the plaintiff, they both would have had bruises or swelling on their heads). The ALJ further found that Penelope's testimony indicated that L.G. was not the aggressor. The ALJ noted that L.G. was possessive of his room and his things and that it made sense that he would try to keep his father out.

¶ 16     The ALJ additionally found that although it was not clear what happened during the fight, it was clear that L.G. was injured when it was over. He had pain in his side and a scratch on his elbow and was diagnosed with a contusion to his right side or ribcage. The diagnosis was consistent with L.G.'s statement that he and his father fought, and the injury was consistent with a strike to that area.

¶ 17     The ALJ further found that as the plaintiff was aware that L.G. had special needs, he should have been more sensitive to those needs and not resorted to violence and abuse. The ALJ therefore recommended that the Director of DCFS deny the plaintiff's request to expunge the indicated finding.

¶ 18     On July 11, 2019, Acting Director Smith adopted the recommendation of the ALJ and issued the final administrative decision in the case, denying the plaintiff's request to expunge the indicated finding. The plaintiff then filed a complaint for administrative review in the circuit court. On December 2, 2020, the circuit court denied the plaintiff's request for expungement. The plaintiff thereafter filed a timely notice of appeal.

¶ 19                                    II.   ANALYSIS

¶ 20     On appeal, the plaintiff argues that the Director's decision not to expunge the indicated

finding from the central register was against the manifest weight of the evidence.  He also argues

that DCFS should not have made an indicated finding without first interviewing him in person.

Further, he argues that his due process rights were violated due the ALJ's failure to conduct a

hearing within 90 days of his request that the indicated finding be expunged and because of

DCFS's failure to maintain an adequate record of the proceedings.

¶ 21                         A.   Sufficiency of the Evidence

¶ 22     We briefly set forth the statutory and regulatory framework necessary to understand the

plaintiff's argument on appeal.  Under the Reporting Act (325 ILCS 5/1 *et seq.* (West 2018)),

DCFS maintains a central register of all reported cases of suspected child abuse or neglect.  325

ILCS 5/7.7 (West 2018).  When DCFS investigates a report of abuse or neglect, it must determine

whether the report is "indicated," "unfounded," or "undetermined."  325 ILCS 5/7.12 (West 2018).

A report is "indicated" if "an investigation determines that credible evidence of the alleged abuse

or neglect exists."  325 ILCS 5/3 (West 2018).  An indicated report must be entered in the central

register.  325 ILCS 5/7.12 (West 2018).

¶ 23     A person who is subject to an indicated report, like the plaintiff, has the right to an

administrative appeal and to request that the report be expunged.  325 ILCS 5/7.16 (West 2018).

DCFS has the burden of proof in justifying its refusal to expunge the indicated report and must

prove that a preponderance of the evidence supports the indicated finding.  89 Ill. Adm. Code

336.100(e) (2000). Following a hearing, the ALJ makes a recommendation to the DCFS director,

who may accept, reject, amend, or return the recommendation.  89 Ill. Adm. Code 36.220(a)

(2005).  The director's decision is the final administrative decision, review of which is governed

by the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2018)). 325 ILCS 5/11.6 (West 2018). Jurisdiction to review final administrative decisions is vested in the circuit court, from which a party may appeal to this court. 735 ILCS 5/3-104, 3-112 (West 2018). This court, however, reviews the decision of the agency and not the circuit court. *Provena Covenant Medical Center v. Department of Revenue*, 236 Ill. 2d 368, 386 (2010).

¶ 24 In this case, DCFS indicated the plaintiff for abuse. Section 3 of the Reporting Act (325 ILCS 5/3 (West 2018)) defines an "abused child" as, in relevant part, one whose parent or other responsible person:

"(a) inflicts, causes to be inflicted, or allows to be inflicted upon such child physical injury, by other than accidental means, which causes death, disfigurement, impairment of physical or emotional health, or loss of any bodily function; [or] (b) creates a substantial risk of physical injury to such child by other than accidental means which would be likely to cause death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function[.]" *Id.*

¶ 25 Section 4 of the Children and Family Services Act (20 ILCS 505/4 (West 2018)) grants DCFS the authority "[t]o make all rules necessary for the execution of its powers." Pursuant to this authority, DCFS has promulgated rules for the enforcement and administration of the Reporting Act. See 89 Ill. Adm. Code 300. Relevant to this case, DCFS promulgated Appendix B, which describes the specific incidents of harm that must be alleged to have been caused by the acts or omissions identified in section 3 of the Reporting Act before DCFS will accept a report of child abuse. 89 Ill. Adm. Code 300. Appendix B, amended at 38 Ill. Reg. 13214 (eff. June 11, 2014). The regulations categorize the incidents of harm into numbered "allegations." The

allegation at issue in this case, allegation No. 10, addresses the existence of a substantial risk of physical injury to the child. *Id.*

¶ 26    Per the regulations, a "[s]ubstantial risk of physical injury" means that a parent or other responsible person "has created a real and significant danger of *physical injury by other than accidental means that would likely cause death, disfigurement, impairment of physical health or loss or impairment of any body function*." *Id.* (emphasis in original).  The regulations further provide that allegation No. 10 should be used when the type or extent of harm to the child is undefined, but "the total circumstances lead a reasonable person to believe that the child is at substantial risk of physical injury." *Id.*    Allegation No. 10 "includes incidents of violence or intimidation directed toward the child that have not yet resulted in injury or impairment but that clearly threaten injury or impairment." *Id.*    Examples of incidents that may create a substantial risk of physical injury include "violently pushing or shoving the child into fixed or heavy objects."

¶ 27    Here, the plaintiff contends that the ALJ's finding that he placed L.G. in substantial risk of physical injury was against the manifest weight of the evidence. He insists that his actions were strictly passive, and he only acted in self-defense.  Alternatively, he insists that his actions were reasonable as he was exercising appropriate discipline.

¶ 28    As noted above, upon administrative review, this court examines the Director's decision, not that of the circuit court.  *Bolger v. Department of Children & Family Services*, 399 Ill. App. 3d 437, 448 (2010).  The applicable standard of review depends on whether the question presented is factual, legal, or involves a mixture of fact and law.  *Id.*    An agency's finding on a question of fact is deemed *prima facie* true and correct and will not be disturbed on review unless it is against the manifest weight of the evidence.  *Plowman v. Department of Children & Family Services*, 2017

IL App (1st) 160860, ¶ 24. A factual finding is not against the manifest weight of the evidence unless the opposite conclusion is clearly evident. *Id.*

¶ 29    In this case, the Director determined that the facts as found established that the plaintiff created a substantial risk of physical injury to L.G. within the meaning of allegation of harm No. 10. That determination involves a mixed question of fact and law, which limits our review to assessing whether the Director's determination was clearly erroneous. *Id.* ¶ 27. Under that standard, an agency's decision will not be disturbed unless it leaves the court with the "definite and firm conviction that a mistake has been committed." *Id.* (quoting *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 395 (2001)).

¶ 30    The record before us contains ample evidence supporting the ALJ's finding that the plaintiff created a substantial risk of physical injury to L.G. The plaintiff acknowledges that he and L.G. were involved in a physical altercation. The plaintiff prolonged that altercation by returning to L.G.'s room after L.G. clearly indicated that he did not want the plaintiff to be there. Penelope's observation of the altercation suggested that the plaintiff was the aggressor as she described how the plaintiff had L.G. on the floor in a wrestling hold (with L.G. screaming); and that she hit the plaintiff with a wooden spoon and told him to let L.G. go. Penelope also described how the altercation had left L.G. emotionally shaken, which is consistent with L.G. complaining of the altercation the following day in school. Dr. Antoniou's report that L.G.'s side was tender to palpation and had a contusion of the ribcage and mid-back indicated that L.G. had been injured in his altercation with the plaintiff. Accordingly, based on this evidence, we cannot say that the ALJ's finding (and the Director's decision accepting that finding) were clearly erroneous. See *id.*

¶ 31    In so ruling, we reject the plaintiff's argument that the ALJ should have placed greater weight on his testimony that he was only acting in self-defense or exercising reasonable parental

discipline. In raising this argument, the plaintiff essentially asks us to substitute our judgment for that of the trier of fact by reweighing the evidence and drawing our own conclusion as to the credibility of the witnesses. That is not the function of this court, however, as it is the province of the administrative agency to determine the credibility of witnesses and resolve conflicts in the evidence. See *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 540 (2006).

¶ 32     B.     Failure to receive an in-person interview before DCFS made indicated finding

¶ 33     The plaintiff's next contention on appeal is that DCFS should not have made an indicated finding without first talking to him in person. We decline to review DCFS's determination to indicate. As previously discussed, the Director's determination is the final administrative decision, not DCFS's initial determination to indicate. Thus, on appeal we do not review the propriety of DCFS's investigation as the plaintiff argues, but instead may only consider the ultimate decision of the agency. *L.F. v. Department of Children & Family Services*, 2015 IL App (2d) 131037, ¶¶ 45-46, (DCFS Director's decision to accept, reject, amend, or return the ALJ's recommendation is the "final administrative decision" subject to judicial review).

¶ 34                              C.    Due Process

¶ 35     The plaintiff also argues that his due process rights were violated. Specifically, he complains that his rights were violated when (1) when the Director failed to issue a final decision in a timely manner and (2) DCFS did not maintain a sufficient record of the proceedings.

¶ 36     An indicated report recorded in the Illinois Central Register affects a protectable liberty interest under the Illinois and U.S. Constitutions because it affects one's ability to obtain employment. *Lyon v. Department of Children & Family Services*, 209 Ill. 2d 264, 278 (2004). Thus, before the right can be infringed, "subjects have a significant interest in obtaining a hearing

and a final decision in a prompt and efficient manner so that indicated reports, if mistaken, are expunged as quickly as possible to minimize their damaging impact." *Id.*

¶ 37    The Illinois Administrative Code provides that "[t]he Director of the Department shall issue the final decision within 90 calendar days after the receipt of a timely and sufficient request for an appeal, unless extended by action of the appellant." 89 Ill. Adm. Code § 336.220(a)(2). The rule does not contemplate including in the tally of days those delays that are requested by, or agreed to by, the subject of the investigation. *Lyon*, 209 Ill. 2d at 282-84.

¶ 38    Here, the plaintiff appealed the indicated finding on September 12, 2018, and the Director issued his final administrative decision on July 11, 2019—302 days later. Much of the delay was due to the plaintiff's actions or continuances to which he agreed (a fact which the plaintiff acknowledges). The parties only dispute whether the delay between February 11and March 30, 2019, should be attributed to the plaintiff. If those days are not, then the Director did not issue his decision within the 90 days set forth in the Code.

¶ 39    The plaintiff's argument is contradicted by the record. The record reveals that on February 11, 2019, an order with the box checked for requests by "Agreement" continued the matter to March 4, 2019, for a pre-hearing conference. It listed the reason as: "Case did not go to hearing today because the parties are still trying to settle and appellant brought more materials to [DCFS's] attorney." On March 5, 2019, an order with the box checked for requests by "Agreement" continued the matter to March 25, 2019, for a prehearing conference. It listed the reason as "Parties are trying to settle." As the plaintiff consented to the delays of which he complains, his due process rights were not violated. *Id.*

¶ 40    The plaintiff's argument that DCFS failed to maintain an adequate record of the proceedings is equally without merit. The gist of the plaintiff's contention is that DCFS violated

his rights when three administrative continuance orders were omitted from the circuit court record. Although those orders were not included in the original record, DCFS filed a motion to supplement the record with those orders, which the trial court granted. As the plaintiff provides no reasonable explanation as to how he was prejudiced by the circuit court's granting of the motion to supplement the record, there is no basis to disturb the circuit court's order.

¶ 41                                       III.   CONCLUSION

¶ 42    For the reasons stated, the judgment of the circuit court of Lake County is affirmed.

¶ 43    Affirmed.